IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CRISTINA N. SANTOS                      :

                                        :

    v.                                  : Civil Action No. DKC 2006-1173

                                        :

CHASE INSURANCE LIFE AND
 ANNUITY COMPANY                        :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this breach of contract case are (1) the motion of Defendant Chase Insurance Life and Annuity Company ("Chase") to amend its answer and counterclaim (paper 20); (2) the motion of Plaintiff Cristina N. Santos ("Mrs. Santos") for summary judgment (paper 26); and (3) the cross-motion of Chase for summary judgment (paper 29). The issues are fully briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the reasons that follow, the motions of Chase to amend and for summary judgment will be granted and the motion of Mrs. Santos for summary judgment will be denied.

**I. Background**

The following facts are undisputed. During March and April of 2003, Reynaldo E. Santos ("Mr. Santos") completed an application for life insurance coverage with Federal Kemper Life Assurance Company, now known as Chase. Chase approved the application and issued policy number FK3234399 ("the policy") to Mr. Santos, effective May 16, 2003. The face amount of the policy was $100,000. Approximately one year later, on May 28, 2004, Mr.

Santos died from lung cancer.  Mrs. Santos, the widow of Mr. Santos, submitted a claim for death benefits to Chase as the primary beneficiary named in the policy.

The policy contained a contestability provision allowing Chase to contest the validity of the policy for two years from the date of issue.  Chase conducted an investigation in accordance with the two-year contestability provision.  During the course of its investigation, Chase obtained copies of Mr. Santos's medical records.  Chase concluded that Mr. Santos made material misrepresentations on his policy application about his use of alcohol.  By letter dated January 4, 2005, Chase informed Mrs. Santos that it was denying her claim because the policy was null and void due to material misrepresentations made by Mr. Santos on the policy application.  Chase enclosed a check tendering a return of the premiums paid by Mr. Santos.

On March 31, 2006, Mrs. Santos filed a complaint in the Circuit Court for Prince George's County, Maryland, alleging that Chase breached the insurance contract by failing to pay the benefits to her.  (Paper 2).  Chase removed the action to this court and filed an answer and counterclaim on May 17, 2006. (Paper 9).  In the counterclaim, Chase sought an order declaring the policy to be void *ab initio* based on the material misrepresentations made by Mr. Santos in the application.

During the course of discovery, Chase served 30 third-party document subpoenas seeking, among other things, the complete medical records of Mr. Santos.  All documents received in response to the third-party subpoenas were provided to Mrs. Santos in accordance with her written request (paper 27, Ex. 5).  In reviewing these documents, Chase discovered what it concluded to be evidence of additional misrepresentations made by Mr. Santos on his policy application.  Chase focused on two documents in particular. First, Dr. William Gaver wrote in his notes that he advised Mr. Santos to reduce his alcohol use during a routine medical exam on January 11, 1999.  (Paper 27, Ex. 1).  Second, Dr. Rosario Fernandez diagnosed Mr. Santos with a deformed duodenal bulb and gastric ulcer in 2000.  (Paper 27, Ex. 2).

Chase filed a motion to amend its answer and counterclaim to reflect this additional information on January 19, 2007.  (Paper 20).  Mrs. Santos objected to the motion to amend because she contends that the affidavits of the doctors discussing their medical reports were obtained in violation of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320(d) et seq.  Mrs. Santos filed a motion for summary judgment on February 5, 2007 (paper 26) and Chase filed a cross-motion for summary judgment on February 26, 2007 (paper 29).

## II.  Motion to Amend

### A. Standard of Review

The scheduling Order set the deadline for amendment of pleadings as July 3, 2006. (Paper 10).  Chase filed its motion to amend on February 15, 2007.  As this court has noted, an attempt to amend the pleadings in a case after a scheduling order deadline for such amendments requires a court to consider the conflicting language of Fed.R.Civ.P. 15(a) and 16(b).  Pursuant to Fed.R.Civ.P. 15(a), leave of court is generally required for an amendment to a pleading including an answer, but "leave shall be freely given when justice so requires."  Fed.R.Civ.P. 16(b), however, provides that a scheduling order "shall not be modified except upon a showing of good cause."

This court previously observed that

> [a]lthough neither the [United States Court of Appeals for the] Fourth Circuit nor the [United States] Supreme Court has addressed directly the dynamic between these two rules at this procedural juncture, a majority of circuits "have held that Rule 16(b)'s 'good cause' standard, rather than Rule 15(a)'s 'freely given' standard, governs motions to amend filed after scheduling order deadlines." To that end, [the party seeking leave to amend] first must satisfy the good cause standard of Rule 16(b) and, if successful, then must pass the tests for amendment under Rule 15(a).

*CompuSpa, Inc. v. Int'l Bus. Machines, Corp.*, No. Civ. A. DKC 2002-0507, 2004 WL 1459272, at *2 (June 29, 2004) (quoting *O'Connell v. Hyatt Hotels of Puerto Rico*, 357 F.3d 152, 154-55 (1st Cir. 2004));

4

*accord Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F.Supp.2d 618, 631 (D.Md. 2003) (citing *Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 373 (D.Md. 2002)).  Since this court's opinion in *CompuSpa, Inc.* was issued, an unpublished disposition by the Fourth Circuit has reached the same conclusion, that a party moving to amend a pleading after a scheduling order deadline must first satisfy the good cause standard of Fed.R.Civ.P. 16(b).  *Montgomery v. Anne Arundel County, Md.*, 182 F.App'x 156, 162 (4th Cir. 2006) (Unpublished Disposition) (affirming denial of leave to amend complaint because plaintiff could have submitted motion to amend before scheduling Order deadline but did not do so).  While the above cited cases each involved a motion by a plaintiff to amend the complaint, the same standard of "good cause" applies to a motion by a defendant to amend an answer.  *Interstate Narrow Fabrics, Inc. v. Century USA, Inc.*, 218 F.R.D. 455, 460 (M.D.N.C. 2003) (denying  motion to amend answer to add valid statute of limitations defense that had been "overlooked" prior to the deadline to amend pleadings under scheduling Order).

The "good cause" standard of Fed.R.Civ.P. 16(b)

> focuses on the timeliness of the amendment and
> the reasons for its tardy submission.  Because
> a court's scheduling order "'is not a
> frivolous piece of paper, idly entered, which
> can be cavalierly disregarded by counsel
> without peril,'" *Potomac Electric Power Co. v.
> Electric Motor Supply, Inc.*, 190 F.R.D. 372,
> 375-376 (D.Md. 1999) [()quoting *Gestetner
> [Corp.] v. Case Equipment Co.*, 108 F.R.D. 138,
> 141 (D.Me. 1985)()], a movant must demonstrate

that the reasons for the tardiness of his
motion justify a departure from the rules set
by the court in its scheduling order.

The primary consideration of the Rule
16(b) "good cause" standard is the diligence
of the movant.   Lack of diligence and
carelessness are "hallmarks of failure to meet
the good cause standard."   *West Virginia
Housing Dev. Fund v. Ocwen Technology Xchange,
Inc.*, 200 F.R.D. 564, 567 (S.D.W.Va.2001).
"[T]he focus of the inquiry is upon the moving
party's reasons for seeking modification.   *If
that party was not diligent, the inquiry
should end.*"   *Marcum [v. Zimmer]*, 163 F.R.D.
[250 ,] 254 [(S.D.W.Va. 1995)].

*Rassoull*, 209 F.R.D. at 374 (emphasis in original).

**B. Analysis**

Chase filed a motion seeking leave to amend its answer and
counterclaim in order to have its pleadings conform to the evidence
revealed in discovery.   (Paper 20).   Specifically, Chase seeks to
add that, in addition to materially misrepresenting the extent of
his daily alcohol consumption, Mr. Santos also materially
misrepresented that (1) he had never been treated for a digestive
disorder, (2) he had never been advised by a physician to reduce
his alcohol consumption, (3) he had not consulted a doctor or
medical professional within the preceding five years, and (4) he
had never been treated for a stomach ulcer.   (Paper 20, at 5-6; *id.*
Ex. 1B ¶¶ 8-13).

Mrs. Santos objects to the motion, alleging that the evidence
with which Chase seeks to amend its answer was obtained in
violation of HIPAA and its counterpart under Maryland law, Md. Code

6

Ann., Health Gen. § 4-306.  Mrs. Santos does not object to the
production of any medical records.  (Paper 22, at 2).  Rather, Mrs.
Santos contends that Chase violated the medical privacy laws by
contacting Dr. Gaver and Dr. Fernandez, without her knowledge or
consent, and having each doctor complete an affidavit that
interprets the medical record in a manner favorable to Chase.  Mrs.
Santos maintains that she would have objected to these *ex parte*
communications with the doctors.  She asks that the court deny
Chase's motion to amend and that it suppress the doctors'
affidavits.

HIPAA is more stringent than Maryland law on the issue of *ex
parte* communications with health providers and thus, HIPAA preempts
Maryland law in this case.

> HIPAA and the related provisions established
> in the Code of Federal Regulations expressly
> supercede any contrary provisions of state law
> except as provided in 42 U.S.C. §
> 1320d-7(a)(2).  Under the relevant exception,
> HIPAA and its standards do not preempt state
> law if the state law relates to the privacy of
> individually identifiable health information
> and is "more stringent" than HIPAA's
> requirements.  42 U.S.C. § 1320d-7(a)(2)(B)
> (referring back to the Historical and
> Statutory notes to 42 U.S.C § 1320d-2); 45
> C.F.R. § 160.203. . . . Since Maryland law
> fails to satisfy the "more stringent"
> standard, federal law is controlling and all
> *ex parte* communications must be conducted in
> accordance with the procedures set forth in
> HIPAA.

*Law v. Zuckerman*, 307 F.Supp.2d 705, 708-11 (D.Md. 2004)

HIPAA sets forth the guidelines for the release of health information.  Health information includes:

> any information, whether oral or recorded in any form or medium, that: (1) is created or received by a health care provider . . . ; and (2) relates to the past, present or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present or future payment for the provision of health care to an individual.

45 C.F.R. § 160.103.  When medical information is to be released in response to a subpoena or discovery request, the health care provider must receive satisfactory assurance that there have been good faith attempts to notify the subject of the protected health information in writing of the request and that the subject has been given the opportunity to object.  45 C.F.R. § 164.512(e)(1)(ii)(A).  Chase complied with this requirement and, indeed, Mrs. Santos concedes that the documents were produced in accordance with HIPAA.

After it received the requested documents, Chase sent letters to Dr. Fernandez and Dr. Gaver requesting their help in authenticating the medical records.  (Paper 27, Exs. 6 & 7).  Attached to the letters were proposed affidavits.  The letters stated, among other things: "Please review your medical record and the proposed affidavit.  If the affidavit is true and accurate, please execute the affidavit and return it to me.  If any revisions are necessary, then please contact me so the appropriate changes

can be made." (*Id.*).  Both doctors signed the proposed affidavits without making any revisions.

Chase argues, and the court agrees, that to the extent the affidavits contain any protected health information, they merely reiterate information that had already been revealed by the medical records attached to the affidavits.  The affidavits simply restate the information in the attached medical records.  (*See* paper 27, Ex. 1, Gaver Aff. ¶ 4) ("As indicated by the Note . . ."); (*id.* Ex. 2, Fernandez Aff. ¶ 4)("As indicated by the Reports . . .").  Chase did not violate HIPAA by its *ex parte* communications with the doctors asking that they authenticate their medical records.  "Mere contact between Plaintiff's physician and Defendant's counsel is not regulated by HIPAA." *Law*, 307 F.Supp.2d at 708.  Nor did Chase violate HIPAA by attaching proposed affidavits that contain restatements of the medical information already revealed by the medical records.  "Congress enacted HIPAA, in part, to protect the security and privacy of individually identifiable health information." *Law*, 307 F.Supp.2d at 710 (citing *United States v. Sutherland*, 143 F.Supp.2d. 609, 612 (W.D.Va. 2001); 45 C.F.R. § 164.501 *et seq.*).  The security and privacy of Mr. Santos's individually identifiable health information was not violated by the doctors' affidavits because that information had been revealed by the subpoenaed documents.

Having found that Mr. Santos's rights under HIPAA have not been violated, the next question is whether Chase should be allowed under Rule 16(b)'s good cause standard to amend its answer and counterclaim to reflect the new evidence. "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts." *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 375 (D.Md. 1999) (internal citations omitted). In *Ngo v. Standard Tools & Equip., Co.*, good cause to modify a scheduling order was found because new evidence surfaced after the close of discovery. Civ. A. No. PJM 99-1186, 2000 WL 1661395, at *4 (D.Md. Oct. 31, 2000). The court likewise finds good cause in this case. Chase did not amend its answer and counterclaim with the new evidence prior to the scheduling Order deadline, not as a result of its lack of diligence or carelessness, but rather because it simply did not have access to the information at that time. Because Chase has shown good cause to amend its answer, the court must now decide whether it passes the test for amendment under Rule 15(a). *See CompuSpa,* 2004 WL 1459272, at *2.

First, there is no undue prejudice to Mrs. Santos, the opposing party. The proposed amendments do not assert a new cause of action against Mrs. Santos nor do they create a need to conduct additional discovery because they are based on facts already in the record. The second factor is whether there was *undue* delay; delay alone is an insufficient reason to deny a motion to amend, *Laber v.*

*Harvey*, 438 F.3d 404, 427 (4th Cir. 2006).  There was no undue delay by Chase.   Once Chase discovered the additional evidence it promptly sought authentication of the medical records.  After the medical records had been duly authenticated, Chase promptly sought leave to amend.  Furthermore, the motion to amend was filed prior to the filing of a dispositive motion by either party.  Finally, there is no evidence of bad faith or dilatory motive on the part of Chase or that the amendment would be futile.  Accordingly, the motion to amend by Chase will be granted.

## III.  Cross Motions for Summary Judgment

### A. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to

11

judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

When faced with cross-motions for summary judgment, as in this case, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). *See also havePower, LLC v. Gen. Electric Co.*, 256 F.Supp.2d 402, 406 (D.Md. 2003) (citing 10A Charles A. Wright and Arthur R. Miller, *Federal Practice & Procedure* § 2720 (3d ed. 1983)).  The court reviews each motion under the familiar standard for summary judgment, *supra*. The court must deny both motions if it finds there is a genuine issue of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment."  10A *Federal Practice & Procedure* § 2720.

**B. Analysis**

When a misrepresentation on a policy application is alleged, Maryland courts engage in "a two-pronged inquiry to determine whether the insurer may validly rescind the policy.  First, the Court must decide whether a misrepresentation occurred. . . . [Second], the Court must determine whether the misrepresentation was material to the risk assumed by the insurer." *Fitzgerald v. Franklin Life Ins. Co.*, 465 F.Supp. 527, 534-35 (D.Md. 1979) (citing cases); *see* Md. Code Ann., Ins. § 12-207(b).

Mrs. Santos argues that she is entitled to summary judgment because there is no evidence that Mr. Santos drank more than one drink per day at the time he completed the policy application, thus there was no misrepresentation. Chase argues that Mrs. Santos's motion for summary judgment should be denied, and its motion should be granted, because even if Mrs. Santos could establish that Mr. Santos was consuming only one alcoholic drink per day at the time of his application, he made a number of other material misrepresentations regarding his medical and social history and, had Mr. Santos answered the questions truthfully, Chase would not have issued the same policy.

### 1. Misrepresentations

Chase initially declined Mrs. Santos's claim for death benefits because it concluded that Mr. Santos had misrepresented that he drank only one alcoholic beverage per day. Mrs. Santos argues that Chase has presented no evidence that, at the time of the application, Mr. Santos consumed more than one alcoholic drink per day. Mrs. Santos testified in her deposition that she helped Mr. Santos arrive at that number by averaging how many alcoholic beverages he had during the week, zero, with how many he had during the weekends, several. (Paper 29, Ex. 1, Santos Dep., at 47-48). She also testified that his answer was truthful and accurate. (*Id.*). Chase argues that Mrs. Santos does not have sufficient personal knowledge of how much alcohol her husband drank at the

14

time of his application because she did not live with him during the week and did not accompany him when he went out during the weekends.  (Paper 29, at 4).  This factual dispute is immaterial because Chase has identified other misrepresentations made by Mr. Santos on his application.

First, two questions asked whether Mr. Santos had been advised by a physician to reduce his alcohol use.  (*See* Paper 29, Ex. 6, at Part A, Question 16.b & Part C, Question 6.b).  Mr. Santos answered "no" to both questions.  (*Id.*).  The affidavit signed by Dr. Gaver stated that in 1999 he advised Mr. Santos to reduce his alcohol consumption.  (Paper 29, Ex. 3, Gaver Aff. ¶ 4).  Mrs. Santos's response to this evidence is to incorporate her arguments from her motion to strike the affidavit (paper 30, at 11); for the reasons stated above, Dr. Gaver's affidavit is admissible.  Mrs. Santos also asserts that a plain reading of the medical record does not suggest that Dr. Gaver advised Mr. Santos to decrease drinking.  (*Id.*).  The medical record itself is written in shorthand and is difficult to read.  The pertinent part appears to read, "He also drinks = 2-3 beers/d as well as some wine.  I discussed rdn . . . drinking . . . is going to (downward arrow) his ETOH intake."  "ETOH is a shorthand for the chemical designation of ethanol which is the alcohol in alcoholic beverages."  *Lamm v. Provident Life & Accident Ins. Co.*, No. Civ. JFM-04-1341, 2004 WL 1778850, *1 n.4 (D.Md. Aug. 6, 2004).  Dr. Gaver's testimony that the Note

"indicated . . . [that he] advised Mr. Santos, among other things, to reduce his alcohol consumption" is consistent with the medical record itself and only serves to clarify his handwriting, symbols, and shorthand.  Mrs. Santos has not deposed Dr. Gaver nor submitted a contrary affidavit from him.  Mrs. Santos's mere assertion that the medical record does not state what Dr. Gaver testified that it states is not evidence and is insufficient to raise a dispute of fact.  Thus, the undisputed evidence shows that Dr. Gaver advised Mr. Santos to reduce his alcohol consumption in 1999 and that in 2003 Mr. Santos stated that he had never been advised by a physician to reduce his alcohol consumption.  Mr. Santos misrepresented that he had never been advised by a physician to reduce his alcohol use.

Second, Mr. Santos was asked whether he had ever been treated for or diagnosed with a digestive disease or disorder (*see* paper 29, Ex. 6, at Part A, Question 15.b) or whether he had ever had or been treated for an ulcer (*id*. at Part C, Question 2.g).  Mr. Santos answered "no" to both questions.  Dr. Fernandez diagnosed Mr. Santos with a peptic ulcer and deformed duodenal bulb and referred him to a gastric specialist in 2000.  (Paper 29, Ex 2, Fernandez Aff. ¶ 5).  Mrs. Santos concedes that Mr. Santos was diagnosed with a peptic ulcer and that a peptic ulcer is a digestive disease or disorder.  (Paper 29, Ex. 1, Santos Dep., at 52).  She asserts, however, that Mr. Santos did not believe that he

had an ulcer and therefore never took any of the medications prescribed by Dr. Fernandez. (Paper 30, at 8 n.1). The questions asked, however, whether Mr. Santos had ever been diagnosed or treated for an ulcer, which he plainly had been. Mr. Santos's subjective belief that the diagnosis was in error is immaterial to the question of whether he made a misrepresentation because a material misrepresentation may invalidate a policy "even if the material misrepresentation is made in good faith." *Jackson v. Hartford Life & Annuity Ins. Co.*, 201 F.Supp.2d 506, 512 (D.Md. 2002). Mr. Santos misrepresented that he had never been diagnosed with or treated for a digestive disorder, in general, or an ulcer, in particular.

Third, two questions asked whether Mr. Santos had consulted a physician or medical practitioner in the preceding five years. (*See* Paper 29, Ex. 6, at Part A, Question 17.a & Part C, Question 8.a). Mr. Santos answered "no" to both questions. (*Id.*). Mr. Santos filed the application in 2003. He consulted with Drs. Gaver and Fernandez in 1999 and 2000, respectively. Thus, both consultations were within the preceding five years. Mrs. Santos asserts that these consultations were for minor and temporary ailments and "the failure to disclose consultations with a physician for minor or temporary ailments will not avoid a policy." *Nationwide Mut. Ins. Co. v. McBriety*, 246 Md. 738, 745 (1967). This argument goes to the materiality of the misrepresentation, not

to whether there actually was a misrepresentation.   Mrs. Santos appears to concede that Mr. Santos misrepresented that he had not consulted a physician within the five years prior to his application.

## 2.  Materiality

The test for materiality is "whether the false representation 'would reasonably influence the insurer's decision as to whether it should insure the applicant.'" *Fitzgerald*, 465 F.Supp. at 535 (quoting *Silberstein v. Mass. Mutual Life Ins. Co.*, 189 Md. 182, 190 (1947)).   Maryland codified the test for materiality as follows: if the correct facts had been made known to the insurer it would not have "(i) issued, reinstated, or renewed the policy or contract; (ii) issued the policy or contract in as large an amount or at the same premium or rate; or (iii) provided coverage with respect to the hazard resulting in the loss."  Md. Code Ann., Ins. § 12-207.  "[T]he materiality inquiry focuses on what the insurer's use of the undisclosed information would have been in determining the life risk of the insured at the time of application for the policy rather than the relationship of the information to the disease that caused the insured's death." *Fitzgerald*, 465 F.Supp. at 535.

Chase has offered undisputed evidence that it would not have issued the policy at the same rate, and it may have denied the application altogether, had Mr. Santos answered the questions on

the application truthfully. Jonathan Orendorff, senior underwriting consultant, was responsible for the decision to deny the claim for death benefits in this case. (Paper 29, Ex. 8, Orendorff Dep., at 69). Mr. Orendorff testified that if the records from Dr. Gaver and Dr. Fernandez had been considered by the underwriter at the time of the application, Chase would not have issued the policy it issued to Mr. Santos at the same rate class. (*Id.* at 100).

Mr. Orendorff testified that had Mr. Santos truthfully disclosed that his physician had advised him to reduce his alcohol use and that he had been diagnosed with a gastric ulcer, then Chase would have conducted further inquiries, including a request for Mr. Santos's medical records pertaining to these disclosures. (*Id.* at 48-49, 88-90). Mr. Orendorff explained that had Chase examined these medical records, it would have discovered Dr. Fernandez's note that Mr. Santos reported consuming five beers per day and six ounces of gin per day for the past twenty years. (*id.* at 90; *see id.* Ex. 2, Fernandez Decl. ¶ 4). This amount of alcohol consumption would be considered an "ongoing heavy alcohol use history" and Chase would have investigated the alcohol use further. (Paper 29, Ex. 8, Orendorff Dep., at 51). Chase's underwriting guidelines define chronic heavy alcohol use as five or more drinks daily or near daily. (Paper 8, Ex. 15). Mr. Orendorff stated that Dr. Fernandez's note indicated that Mr. Santos was a chronic heavy

alcohol user at least as of the time the note was written, in 2000. (*Id.* at 53). When posed with a hypothetical situation that if the underwriter had known that in 2000 Mr. Santos drank 5 beers and six ounces of gin per day, but in 2003 he only had one drink a day, Mr. Orendorff responded: "Because of the history of chronic heavy alcohol use and the continued use of alcohol one per day, my judgment would have been to issue this case at a rated level, a rated rate class, a substandard rate class. . . . [The premium] would have been higher than it was actually issued." (*Id.* at 54-55).

Mrs. Santos responded that Chase is trying to portray Mr. Santos as an alcoholic and that a number of medical records support the assertion that Mr. Santos was not consuming excessive amounts of alcohol a day. (Paper 30, at 1). Mrs. Santos also asserts that Mr. Santos's gastric ulcer could have been caused by a number of other factors, such as cigarette smoking, caffeine, and stress. (Paper 30, at 9). The materiality inquiry does not revolve around whether Mr. Santos *actually* drank excessive amounts of alcohol, or whether his gastric ulcer was *actually* caused by his alcohol use. The issue is whether the information that Mr. Santos misrepresented would have affected the risk as it was perceived by Chase; and thus whether it would have affected Chase's decision to approve Mr. Santos's application and at what rate to issue the policy. *See Fitzgerald*, 465 F.Supp. at 535 ("A fair test of the materiality of

a fact is . . . whether reasonably careful and intelligent men would have regarded the fact, communicated at the time of effecting the insurance, as substantially increasing the chances of the loss insured against.") (quoting *Metro. Life Ins. Co. v. Samis*, 172 Md. 517, 524 (1937)).   Mrs. Santos has not offered any evidence to counter Chase's evidence that, had Mr. Santos answered the questions truthfully, it would not "under any circumstances . . . have issued the policy that it in fact issued to Mr. Santos in May of 2003."   (Paper 29, Ex. 8, Orendorff Dep., at 100-01).

Chase has shown that Mr. Santos made misrepresentations on his policy application and that they were material to the risk assumed by the insurer as a matter of law.   In its motion for summary judgment, Chase asks the court to issue a declaration that the contract was void *ab initio* and that Chase properly rescinded the policy.

### 3.   Rescission

"The rescission of a contract involves voiding it Ab initio and returning the parties to the Status quo ante." *Dialist Co. v. Pulford*, 42 Md.App. 173, 177 n.3 (1979).   "Rescission requires at a minimum that the party exercising a right to rescind notify the other party and demonstrate an unconditional willingness to return to the other party both the consideration that was given and any benefits received.   The right to rescission must be exercised within a reasonable time, which is determined, in large part, by

21

whether the period has been long enough to result in prejudice." *Benjamin v. Erk*, 138 Md.App. 459, 482-83 (2001) (internal citations omitted).  The appropriate focus of the timeliness question is at what point the insurer learned the facts that would justify rescission.  *Monumental Life Ins. Co. v. U.S. Fidelity and Guar. Co.*, 94 Md.App. 505, 541 (1993).

Mr. Santos died on May 28, 2004.  When Mrs. Santos submitted the claim for death benefits to Chase shortly thereafter, it began its investigation pursuant to the two-year contestability provision.[1]  Chase sent Mrs. Santos a letter on January 4, 2005, explaining that it had uncovered information that was not admitted to on the application, that had this information been revealed on the application it would not have issued the policy as applied for, and tendering her a refund on the premiums paid on the policy. Thus, Chase notified Mrs. Santos of its intent to rescind the policy promptly after learning of the facts that would justify rescission.  Chase exercised its right to rescind within a reasonable time, approximately six months after Mr. Santos's death. Chase also returned to Mrs. Santos the full value of the consideration it received.  (Paper 29, Ex. 14).  Chase properly rescinded the policy.

_____

[1]  The timeliness inquiry begins when Mrs. Santos submitted the claim for death benefits because any reliance by Mr. and Mrs. Santos on the policy prior to Mr. Santos's death was unreasonable given that they were on notice of the two year contestability provision in the policy.

Mrs. Santos did not cash the check from Chase refunding the premiums paid on the policy.  That check is now void due to the lapse of time since it was issued.  Chase will be directed to issue to Mrs. Santos another check fully refunding the premiums paid on the policy.

**IV.  Conclusion**

For the foregoing reasons, the motion of Mrs. Santos for summary judgment will be denied and the motions of Chase (1) to amend its answer and counterclaim and (2) for summary judgment will be granted.  A separate Order will follow.

<pre>
                    _____/s/_____
                    DEBORAH K. CHASANOW
                    United States District Judge
</pre>